## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## SHERMAN DIVISION

| | |
|---|---|
| FEDERAL TRADE COMMISSION, )<br><br>Plaintiff, )<br><br>v. )<br><br>ADVOCARE INTERNATIONAL, L.P., a limited partnership, )<br><br>BRIAN CONNOLLY, )<br><br>DANNY McDANIEL, )<br><br>DIANE McDANIEL, )<br><br>CARLTON HARDMAN, and )<br><br>LISA HARDMAN, )<br><br>Defendants. ) | **Case No.** _____ |

## PLAINTIFF'S COMPLAINT FOR
## <u>PERMANENT INJUNCTION AND OTHER EQUITABLE RELIEF</u>

Plaintiff, the Federal Trade Commission ("FTC"), for its Complaint alleges:

1.      The FTC brings this action under Section 13(b) of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 53(b), to obtain permanent injunctive relief, rescission or reformation of contracts, restitution, the refund of monies paid, disgorgement of ill-gotten monies, and other equitable relief for Defendants' acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a) in connection with the advertising, marketing, promotion, and operation of a multi-level marketing business opportunity.

1

## JURISDICTION AND VENUE

2.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337(a), and 1345.

3.      Venue is proper in this District under 28 U.S.C. § 1391(b)(2) and (c)(2) and 15 U.S.C. § 53(b).

## PLAINTIFF

4.      The FTC is an independent agency of the United States Government created by statute. 15 U.S.C. §§ 41–58. The FTC enforces Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), which prohibits unfair or deceptive acts or practices in or affecting commerce.

5.      The FTC is authorized to initiate federal district court proceedings, by its own attorneys, to enjoin violations of the FTC Act and to secure such equitable relief as may be appropriate in each case, including rescission or reformation of contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies. 15 U.S.C. § 53(b).

## DEFENDANTS

6.      Defendant AdvoCare International, L.P. ("AdvoCare") is a Delaware limited partnership with its principal place of business at 2801 Summit Avenue, Plano, Texas 75074. In connection with the matters alleged herein, AdvoCare transacts or has transacted business in this District and throughout the United States. At all times material to this Complaint, acting alone or in concert with others, AdvoCare has advertised, marketed, distributed, or sold a business opportunity to consumers throughout the United States.

7.      Defendant Brian Connolly is a former Chief Executive Officer of AdvoCare and former Executive Chair of AdvoCare's Board of Directors, having resigned from these roles in April 2019. At times material to this Complaint, acting alone or in concert with others, he has

formulated, directed, controlled, had the authority to control, or participated in the acts and practices of AdvoCare set forth in this Complaint. Defendant Connolly resides in New Jersey and, in connection with the matters alleged herein, transacts or has transacted business in this District.

8.      Defendant Daniel McDaniel, also known as Danny McDaniel, is a leading promoter of the AdvoCare business opportunity. At all times material to this Complaint, he has participated in the acts and practices set forth in this Complaint. Danny McDaniel is married to Defendant Diane McDaniel, resides in Texas, and, in connection with the matters alleged herein, transacts or has transacted business in this District and throughout the United States.

9.      Defendant Diane McDaniel (together with Danny McDaniel, "the McDaniels") is a leading promoter of the AdvoCare business opportunity. At all times material to this Complaint, she has participated in the acts and practices set forth in this Complaint. Diane McDaniel resides in Texas and, in connection with the matters alleged herein, she transacts or has transacted business in this District and throughout the United States.

10.     Defendant Carlton Hardman is a leading promoter of the AdvoCare business opportunity. At all times material to this Complaint, he has participated in the acts and practices set forth in this Complaint. Carlton Hardman is married to Defendant Lisa Hardman, resides in Alabama, and, in connection with the matters alleged herein, transacts or has transacted business in this District and throughout the United States.

11.     Defendant Lisa Hardman (together with Carlton Hardman, "the Hardmans") is a leading promoter of the AdvoCare business opportunity. At all times material to this Complaint, she has participated in the acts and practices set forth in this Complaint. Lisa Hardman resides in

Alabama and, in connection with the matters alleged herein, transacts or has transacted business in this District and throughout the United States.

## COMMERCE

12.     At all times material to this Complaint, Defendants have maintained a substantial course of trade in or affecting commerce, as "commerce" is defined in Section 4 of the FTC Act, 15 U.S.C. § 44.

## DEFENDANTS' BUSINESS PRACTICES

### INTRODUCTION AND OVERVIEW

13.     Founded in 1993, AdvoCare is a multi-level marketing company that promotes health and wellness products through a network of business opportunity participants—called Distributors—who can purportedly earn compensation by selling AdvoCare products and by recruiting participants into their "downline."

14.     To convince consumers to pursue AdvoCare's business opportunity, Defendants claim that AdvoCare offers the average person a financial solution that will enable them to earn unlimited income, attain financial freedom, and eliminate the constraint of traditional employment. In reality, the overwhelming majority of Distributors never earn compensation from the company.

15.     AdvoCare charges consumers $59 to become a Distributor. Distributors can recruit a downline and earn wholesale commissions ranging from five to twenty percent of purchases by certain members of their downline. Distributors receive a discount on products and are eligible to sell products to the public.

16.     However, to earn all possible forms of compensation AdvoCare offers, consumers must become Advisors. In addition to earning wholesale commissions and being eligible to sell

products, Advisors are eligible to earn overrides, leadership bonuses, and incentives (collectively, "Advisor income").  Advisor income is based on the purchase volumes of downline Advisors and their recruits, with the highest rewards going to those who recruit the most Advisors and generate the most volume from Advisors in their downline. The clear directive of this structure is—as a leading Distributor instructed consumers at Success School, AdvoCare's marquee annual training event, which all of the Individual Defendants regularly attend and present at—for consumers to "recruit business builders who recruit business builders who recruit business builders. . . ."

17.     To reach Advisor, consumers must pay the Distributorship fee and meet certain AdvoCare product purchase requirements, measured as personal and group volume ("PGV"). Consumers typically spend between $1,200 and $2,400 purchasing AdvoCare products to reach Advisor.

18.     AdvoCare's compensation plan contains recurring incentives to encourage business opportunity participants to purchase large quantities of product. Advisors must accumulate thousands of dollars of product purchase volume each year to become and remain Advisors. They must meet volume thresholds to earn Advisor income each pay period and to advance to higher ranks in AdvoCare, where they can receive bigger bonuses.

19.     Given the incentives for business opportunity participants to continually purchase large volumes of product, product purchases are driven by the compensation plan and not by consumer demand for AdvoCare products, leading a recent AdvoCare CEO to observe that he was "not concerned about retailing the product . . . . If you package dirt right and it's got PGV on it, the Distributors will buy it."

**DEFENDANTS PROMOTE ADVOCARE'S BUSINESS OPPORTUNITY THROUGH DECEPTION**

20.      To recruit consumers to join AdvoCare, Defendants regularly host events and disseminate materials featuring deceptive income claims. These events and materials include in-person meetings and conferences, webinars, conference calls, podcasts, social media posts, videos, and print materials. Two of the most prominent recruiting materials are *Solutions for Your Success*, a DVD of income testimonials that the company encourages all Distributors to use to recruit new participants, and *Impact*, a magazine the company produces biannually and sends to all new Distributors. Through these events and materials, Defendants promote AdvoCare as a financial solution through which consumers can attain financial freedom and eliminate the constraint of traditional employment.

21.      AdvoCare's network includes hundreds of thousands of Distributors, and the company coordinates its marketing and training efforts with prominent Distributors who can reach large audiences. In particular, AdvoCare relies on Distributors who reach the Diamond rank to market the AdvoCare business opportunity and train others. According to AdvoCare, Diamond Distributors are the "best of the best in AdvoCare" and are "the leaders in the field and from the field's perspective represent AdvoCare." Diamonds Distributors routinely record recruiting and training videos for AdvoCare; create print testimonials for AdvoCare; host AdvoCare recruiting and training calls and podcasts; and attend, speak at, and host AdvoCare events.

*Defendants Promote AdvoCare as a Life-Changing Financial Solution*

22.      Since at least 2014, Defendants have marketed the AdvoCare business opportunity through personal stories touting the improved lifestyle and unlimited income

opportunity purportedly available through AdvoCare. Defendants have published thousands of deceptive income claims, and the below claims are mere examples of their conduct:

a.   In an August 2018 recruiting video that the company posted on its Facebook and YouTube pages, an AdvoCare General Manager said that she asks consumers, "What's that amount per month that you'd like to earn? And then a year from now let's look at that and let's decide: is that the same amount or maybe you want to give yourself a raise? The great thing about owning your own business is that you can." She then showed a graphic of a Distributor with annual earnings of more than $413,000, which she referred to as "astounding income." Closing the video, she stated that if consumers wanted "a part-time income . . . a full-time income, [had] a desire to be at home with your family, a desire to travel, or to be able to take your family on trips—whatever reason . . . a year from now you will wish you had started today."

b.   At a July 2018 corporate event that was simulcast on one of AdvoCare's Facebook pages, a Diamond Distributor spoke of earning $182,000 in her second year, and asked viewers, "where in corporate America can you give yourself a $100,000 raise by working side-by-side with your best friend?" In the same presentation, the Diamond Distributor's husband spoke of earning $48,000 over six weeks while qualifying for Diamond, and said he asks consumers what they could do with that kind of income.

c.   In a June 2018 episode of AdvoCare's podcast, a Diamond Distributor told listeners his first-year earnings were "between four and five thousand dollars a month" and that he has gone on to earn a "significant seven figure income." He

also told Distributors success is just about emulating successful people—and that if they do that, "[they are] likely to get the same or similar results."

d.   In an October 2015 video currently available on AdvoCare's YouTube page, a Diamond Distributor states, "literally, you could point to a number and say I need to earn that, and we can teach you how to do that."

e.   On a 2012 recorded corporate call to recruits, a Distributor told consumers that "[t]he sky's the limit. There is no ceiling on our income."

f.   In a June 2018 Instagram post, Diane McDaniel asked consumers what they would "say yes to" if time, health, and money were not issues, with hashtags including "#beachhouse," "#dreamcar," "#louisvuitton," and "#financialfreedom."

g.   In a video posted on the McDaniels' website until at least April 2017, Diane McDaniel stated, "the sky is the limit. I'm the variable. I get to decide what I truly want according to the effort I put forth" and that "there is incredible profit that can be made through infinity."

h.   In a video on the McDaniels' website until at least December 2016, Diane McDaniel stated, "whether it's a little or a lot, anywhere from 200 to 500 to 5,000 to 50,000 dollars a month—the sky is the limit here."

i.   Lisa Hardman stated at a recorded 2014 recruiting event that AdvoCare "has the potential, with very little overhead, to pay you millions and millions of dollars" and that "nowhere else in America can you go and earn the kind of income that's possible here."

23.     Other prominent AdvoCare Distributors routinely make similar deceptive claims about unlimited earning opportunities through AdvoCare in widely disseminated recruitment videos and on social media:

a.   In June 2018, a Diamond Distributor posted on Facebook about a Distributor who "left college and decided to work for herself," earned a $10,740 check, and "qualified for a level that pays on average $300k per year." She stated the Distributor "believed she could, [s]o she DID," and used hashtags such as "#residualincome" and "#whynotyou."

b.   In May 2018, a Diamond Distributor posted on his Facebook page, "$2,833,355.94 What if this figure was possible for you to earn with a part-time income opportunity?" In other 2018 social media posts, this Distributor also posted about other Distributors earning nearly $30,000 per month and asked, "what if [this] was possible for you to earn MONTHLY with a part-time opportunity?"; wrote of Distributors getting a $1,000 per month "raise" after just two months in AdvoCare; wrote of showing recruits a "road map to an income that pays out an average of $38,000 a year"; wrote of Distributors pinning levels that he claimed paid an average of $42,000 and $81,000, respectively; and wrote of Distributors earning more than $31,000 in five weeks. In February 2019, AdvoCare named this Distributor its 2018 Distributor of the Year.

c.   In May 2018, a Diamond Distributor posted on her Facebook page about her lifetime earnings of $1.94 million and asked, "[w]hat if this figure was possible for you to earn with a part-time income opportunity?"

     d.  In May 2018, a Diamond Distributor stated in a YouTube video that consumers could earn $76,800 per year by recruiting 40 Advisors. "Where else in the world, on a part-time basis, can you do that? . . . There's people that have done this in 90 days. You're the variable."

     e.  In a January 2018 video available on YouTube, a Diamond Distributor stated that consumers could make "one-hundred dollars a month . . . a thousand . . . ten-thousand, or a hundred-thousand," as AdvoCare "will pay you as much as you're willing to put into it."

     f.  In January 2018, a Diamond Distributor wrote on her Facebook page that consumers could "do anything [they] want with [AdvoCare]," and could earn $10,000 "or MORE" per month.

24.    To convince consumers that they, too, can attain financial freedom as AdvoCare Distributors, Defendants frequently claim that successful Distributors are simply ordinary people who chose to pursue AdvoCare's business opportunity:

     a.  In a May 2018 video posted on AdvoCare.com, a Distributor who purportedly made more than $155,000 in 2017 said that he was drawn to the business after "seeing all of these amazing people" who were "also just ordinary people like [me]."

     b.  In a May 2018 training, a Diamond Distributor told consumers he was "an average person . . . We're just average people, right?"

     c.  In a May 2018 video, a Diamond Distributor told consumers, "we all started at the same spot. Just like you. We are no different. I am no different from you."

    d.   In a May 2015 training currently available on AdvoCare's YouTube page, a Diamond Distributor called AdvoCare "the average person's best chance," after stating that he made $229,000 the previous month. "We're just regular folks, guys. There's nothing special about us."

25.    Defendants train consumers who become Distributors to develop their own stories with earnings claims to recruit new participants into the business opportunity. Defendants teach Distributors to create a narrative of struggling before joining AdvoCare; seeing AdvoCare as an opportunity to change their lives; quickly earning significant income; and being on their way to earning even more money.

26.    Central to Defendants' pitch is the prospect of earning substantial income through AdvoCare. In training events, Defendants teach Distributors to cite dollar amounts. At Success School, one Diamond Distributor called failing to talk about money an "epic fail" because "if you don't talk about money . . . people . . . might think that you're just trying to sell them something . . . . So talk about money."

27.    Similarly, Diane McDaniel told Distributors at a recorded 2014 training event that "[i]f your stories don't have any numbers attached to it, your story stinks. . . . If you don't have numbers, people aren't hearing your stinky story."  She also told Distributors to convince consumers they would "make more money. Because that's the lingo they're looking for—more money. . . . More money. More money."

28.    At a 2014 company event, a Diamond Distributor trained Distributors that they did not need to believe their income projections—they just needed recruits to.

It shocked me how when we said, "this time next year, we're gonna replace our income, be able to leave our jobs," I didn't quite believe it in the back of my mind . . . . But when we would say it, people would say, "really?" and I'm like, oh my gosh, they believed me.

29.     Similarly, AdvoCare's "Notes on Success" training program, currently

available on AdvoCare.com, models a story ending with, "right now, I'm on track for

replacing my full-time income over the next 60 days . . . . If it keeps going . . . I'm gonna

be full-time by the end of the year." AdvoCare calls the training an "absolute must-have

instructional tool." Most recently, in July 2018, a Diamond Distributor posted on

Facebook about the need to project future earnings. "Even at $60k a month we are still

telling people where we are GOING, which is $150,000 a month within the next 3 years."

30.     Defendants instruct Distributors to tell "emotional," rather than "factual," stories.

In a training document used until at least June 2014, the McDaniels provide the following

example of emotional storytelling:

> After 5 years, we have the potential of earning a 2-week pay check, even if we
> decide to retire from the business. One of the ways the company pays is residual
> income, which means you and I can earn money for a lifetime if we build it right.

31.     Finally, Defendants teach Distributors to create a "fear of loss" in recruits, which

reinforces the deceptive message that recruits are likely to earn substantial income. For example,

at AdvoCare's Leadership School, a Diamond Distributor told participants, "'You can lose

$50,000 by not going' works better than, 'Hey, you can gain $50,000 by going.'"

32.     The Hardmans and McDaniels also teach their downlines to use the fear of loss.

In a PowerPoint training presentation used until at least 2015, they told Distributors to tell

prospects that "that they have the opportunity to invest in a company that has the potential to

move & grow like a 'Nike' or a 'Bill Gates[.]' Your Prospect does not want . . . regrets 3 years

down the road because they did not invest in Advocare!"

33.     After representing that consumers can earn unlimited income through AdvoCare,

Defendants have used purported income disclosures to further misrepresent the AdvoCare

business opportunity. Until at least June 2015, AdvoCare excluded non-earners—more than 70 percent of Distributors—from its income disclosure statement, claiming they were not "active." By excluding these Distributors, Defendants severely inflated the percentage of Distributors in each purported income range.

34.     The income ranges on AdvoCare's income disclosure statement were reported as "annual average income" but were actually annualized earnings based only on pay periods where Distributors earned checks. For example, if a Distributor participated in AdvoCare for a full year and earned just one check, AdvoCare multiplied the check by the number of pay periods in the year to calculate the annual average income. One year of income consisting of one $100 check would thereby count as $2,400 in average annual income.  The company printed these purported income disclosures onto posters and sold them to Distributors to use as sales aids.

35.     With AdvoCare's help and approval, the McDaniels created a version of the income disclosure statement that—like AdvoCare's version—reported annualized earnings as averages and ignored Distributors without earnings.



The McDaniels' version also omitted the percentage of Distributors at each pay level and favorably compared purported earnings at AdvoCare to salaries in prestigious careers. Incomes were color-coded, and presenters frequently told consumers they could pick the color of the income they wanted to earn. The McDaniels' income disclosure statement was popular among Distributors. For a number of years, many Diamond Distributors used this form of income disclosure statement in their business opportunity presentations, and by 2013 one version of this form had been downloaded more than 10,000 times from the McDaniels' website.

36.    Both the Hardmans and the McDaniels used versions of this income disclosure statement in their business opportunity presentations until at least mid-2015. The below image is a modified version that the Hardmans used in 2015:

## COMPARABLE SALARIES

| Leadership Level | Amount of Retail Volume | Approximate Override | Leadership Bonus % | Average Total Income 2014 | | Average US Salaries 2013 | |
|---|---|---|---|---|---|---|---|
| Silver | $3,000 | $100 | +3% | $12,817 | | Bank Teller | $25,790 |
| Gold | $15,000 | $500 | +2% | $38,444 | | Dental Assistants | $35,080 |
| Gold 3 Star | $15,000 | $500 | +2% | $42,104 | | Graphic Designer | $48,783 |
| Ruby | $30,000 | $1,000 | +2% | $85,848 | | Teachers | $49,430 |
| Ruby 6 Star | $30,000 | $1,000 | +2% | $105,477 | | Real Estate Agent | $51,930 |
| Emerald | $60,000 | $2,000 | +2% | $198,801 | | Insurance Agent | $63,400 |
| Emerald 9 Star | $60,000 | $2,000 | +2% | $296,935 | | Register Nurse | $67,930 |
| Diamond | $120,000 | $4,000 | +4% | $636,953 | | Accountant | $71,040 |
| Platinum + | $240,000 | $8,000 | +.25% | $1,486,830 | | Pharmacist | $114,950 |
| Double Diamond + | $360,000 | $12,000 | +.25% | | | Lawyer | $126,860 |
| | | | | | | Nurse Anesthetist | $154,390 |
| | | | | | | CEO | $176,840 |
| | | | | | | Family Doctor | $180,850 |

37.    In many instances, Defendants accompany their misleading income representations with purported disclaimers.  These purported disclaimers, which often appear in small print and not in close proximity to the claims made, do not alter the net impression created by Defendants' misleading representations— namely, that Distributors are likely to earn substantial income. For example, AdvoCare's spring 2018 issue of *Impact* magazine includes

large, bolded text announcing earnings as high as $1.1 million per year. Meanwhile, disclosures,
which appear in fine print at the bottom of pages, inflate earnings by reporting average earnings
among Distributors who earned compensation, excluding non-earners from the calculation. The
section also states that earnings depend on "a number of factors, including your individual effort
and the area in which you live" and "do not include earnings from retail sales"—implying that
actual earnings may be higher than reported.

38.     In recruiting videos and presentations, speakers often negate income disclosures
with claims that Distributors "are the variable," a popular phrase used by Distributors including
the Hardmans and McDaniels; "get paid what [they're] worth," as used in a 2018 corporate
income video; or "financially . . . are in complete control of where [they] are going to go," which
appears in an August 2018 income video currently available on AdvoCare's YouTube page.

*Defendants' Earnings Claims are False or Misleading*

39.     Contrary to Defendants' claims, AdvoCare does not offer consumers a viable path
to financial freedom. In 2016, 72.3 percent of Distributors did not earn any compensation from
AdvoCare; another 18 percent earned between one cent and $250; and another 6 percent earned
between $250 and $1,000. The annual earnings distribution is nearly identical for 2012 through
2015.

40.     In 2017, AdvoCare launched a program allowing consumers to sign up as
Preferred Customers in order to purchase products at a discount without pursuing the business
opportunity. Thus, with the Preferred Customer program in place, consumers who are not
interested in pursuing the business opportunity do not need to become Distributors. Even with
this option in place, more than 67 percent of Distributors did not earn compensation from

AdvoCare in the year, while another of 20 percent of Distributors earned between one cent and $200.

41.     The opportunity to earn compensation retailing product is similarly limited. As will be detailed in Paragraphs 62–67, the company discourages Distributors from attempting to sell products. AdvoCare does not allow Distributors to publicly offer a discount on products and does not allow Distributors to sell products through ecommerce channels other than AdvoCare.com.

42.     Departure rates demonstrate that Distributors struggle to retail products. In 2013 and 2014, just 37 percent of Distributors without a downline—who therefore needed to retail products to earn compensation—remained in AdvoCare past one year.

43.     AdvoCare's compensation structure requires participants to make large purchases to qualify and remain eligible to participate fully in the business opportunity. However, the opportunity to earn compensation as an AdvoCare Distributor is limited. As a result, AdvoCare's compensation structure ensures that most participants will lose money or will not realize significant income.

### ADVOCARE OPERATES AS AN UNLAWFUL PYRAMID SCHEME

#### *AdvoCare's Compensation Plan*

44.     AdvoCare's compensation plan is based on becoming an Advisor and recruiting others to do the same. AdvoCare allows all Distributors to earn retail and wholesale commissions.  However, only Advisors are eligible to earn overrides, leadership bonuses, and incentives (collectively, "Advisor income"). In turn, Advisor income can only be earned from product purchases generated by downline Advisors.

45. To become an Advisor, a Distributor must accumulate 2,000 PGV—a term for the suggested retail value of that Distributor's purchases and the purchases of certain members of their downline—within four pay periods.

46. Once they become Advisors, Distributors must keep meeting PGV requirements to earn compensation and to remain Advisors. Each pay period, Distributors must accrue at least 500 PGV to earn overrides and at least 1,000 PGV to earn leadership bonuses.  Each year, Distributors must requalify as Advisors, either by accruing 2,000 PGV within four pay periods or 6,000 PGV over the year.

47. Through this structure, AdvoCare encourages consumers to (a) purchase large volumes of products regardless of retail demand in order to participate fully in the business opportunity and to (b) "duplicate" themselves by recruiting business opportunity participants who will also make large purchases.

48. AdvoCare encourages Distributors to personally purchase products to satisfy compensation plan requirements. AdvoCare requires Distributors to either purchase large quantities of product or convince others to do so in order to (a) qualify for Advisor and be eligible to earn Advisor income; (b) requalify for Advisor and remain eligible to earn Advisor income; and (c) earn Advisor income in a given pay period.

49. Most Advisors personally purchase the vast majority of their qualifying volume. In fact, for years, Defendants have instructed Distributors to personally purchase products to qualify for Advisor. For example, in 2013, AdvoCare instructed Distributors at Success School, its largest annual event, and which often features the Individual Defendants, to become Advisors in one order because they could generate bigger paychecks by spending more money—illustrated

by a slide comparing what could result for Distributors who purchased 3,000 PGV and 500 PGV, respectively, in their first pay periods.



50.     Diamond Distributors continue to teach participants this message. For example, in an April 2018 training available on YouTube, one Diamond Distributor told participants to purchase their Advisor order immediately because "people will often do what you do . . . it duplicates, it's a stronger position . . . and it's just statistically more successful."

51.     AdvoCare has also instructed Distributors to personally purchase products in order to qualify for Advisor in its compensation plan. Until at least November 2014, the plan instructed Distributors "to purchase at least $500 yourself" and to always "track your volume . . . and if necessary, cover the $500 Personal Volume with your own purchases" to ensure they would have the volume needed to qualify for Advisor.

52.     The McDaniels pressured recruits to take financial risks to reach Advisor. In 2013, when one Distributor said he could not afford Advisor because he had just $2,000 saved, Diane McDaniel asked that he "go [half] in with $1,050" and purchase the remaining volume the next pay period. In 2015, a Distributor wrote of "putting [her] faith in [the McDaniels'] hands" while using credit cards she was "hoping not to use" to reach Advisor.

18

53.     Similarly, the Hardmans taught their downline to convince recruits to purchase their Advisor status outright. In at least eight 2012 newsletters, the Hardmans told their downline, "[m]oving people to Advisor . . . in ONE order . . . is ALWAYS BEST!" In a training document used from at least 2012 to 2014, the Hardmans wrote that "[h]ow quickly a person achieves Advisor is very important since the speed of the leader determines the speed of the pack."

54.     Defendants have also trained and encouraged Distributors to personally purchase products apart from Advisor qualification. In a corporate training video still available on YouTube, a former AdvoCare CEO told Distributors to buy 1,000 PGV of product the first day of each period. The Hardmans, meanwhile, told Distributors to stay awake past 1:00 a.m. on the last night of each pay period in order to purchase products to fill any gap in PGV that would otherwise prevent them from earning Advisor income. The Hardmans and McDaniels also frequently ran incentives offering cash bonuses and prizes to Distributors with certain amounts of PGV.

55.     Distributors, including at least 35 Diamond Distributors, also often purchase products on other Distributors' accounts in order to maximize their own bonuses. Some did this for years with the company's knowledge; one even received Distributors' passwords from a company employee in order to place orders in his downline. Others used offline reimbursements, as when the McDaniels promised one Distributor "a check tomorrow" if he placed a $550 order to help them maximize their bonus. These purchases are untethered to retail sales activity or demand and are instead made only to qualify for increased compensation.

56.     Once consumers have made large purchases to qualify for Advisor, Defendants teach consumers to attempt to recruit a downline full of Advisors pursuing the business

opportunity. The below images blueprint what Defendants tell Distributors is the "ideal

organizational structure"—a downline of three Advisors who multiply themselves ad infinitum.



*2015 corporate training*            *May 2018 Diamond training (border added)*

57.    As Defendant Brian Connolly instructed Distributors during a 2016 call, "the

leading indicator of [AdvoCare's] future success . . . is the growth of qualifying Advisors."

58.    Recruiting is so critical to AdvoCare's success that the company carefully tracks

its recruiting numbers and regularly reports those figures to key executives and board members,

including Brian Connolly during his tenure at AdvoCare. AdvoCare reinforces its emphasis on

recruiting business opportunity participants through periodic incentives. For example, between

2014 and 2016, the company ran a Rookie Bonus incentive rewarding Distributors who became

Advisors, recruited at least three Distributors, and generated at least 3,000 PGV from new

recruits. To encourage Distributors to focus on recruiting business opportunity participants, the

company excluded volume from Distributors' retail customers who ordered product directly

from AdvoCare.

59.    The Hardmans and McDaniels share this focus on recruiting business opportunity

participants. Until at least November 2016, they regularly contacted members of their downline

to attempt to convince them to become Advisors. To do so, they used a "prequalification report"

AdvoCare provided to all Distributors. The report tracked how close downline were to becoming

Advisors.

20

60.     Danny McDaniel also sent Distributors notes in December 2013 with the instruction that "if an organization is just bringing in Distributors [it has] no value . . . there has to be [Advisors]."

61.     Similarly, until at least October 2015, the Hardmans used and posted to their website a document instructing new Distributors to focus on recruiting Advisors, claiming Advisor "is always in a person's best interest." And in at least eight newsletters in 2012, the Hardmans taught their downline they could "build staggering income" if they became experts at "moving people to Advisor & [trained their] teams to do the same." They also told Distributors at Success School that getting recruits "to Advisor right now" is "Plan A."

62.     To keep Distributors focused on recruiting Advisors, Defendants discourage Distributors from focusing on selling product. As a Diamond Distributor told the audience at Success School in 2011, "[a]ll of you guys that haven't moved on to where you want to be are selling Spark. I'm not selling Spark [AdvoCare's energy drink]. . . .  I'm selling stay at home mommies. . . . We sell freedom. We don't sell Spark."

63.     Other Diamond Distributors have similarly discouraged consumers from focusing on retail sales. At a 2018 corporate event simulcast on one of AdvoCare's Facebook pages, a Diamond Distributor stated that one month of selling products "gave [her] the confidence to go out and share the business opportunity, because I realized that's the best part of what we have our hands on." In an April 2018 webinar, a Diamond Distributor told recruits that "for about two and a half years, I was building a business—but the wrong way. While [another Distributor] was building a residual income, I was selling retail—I was retailing product."

64.     Another Diamond Distributor instructed Distributors in a 2015 Facebook post that they would "never earn significant income by retailing products" because "retail profits are the LEAST of the five ways we earn income!"

65.     In a training call available on the Hardmans' website until at least November 2016, a Diamond Distributor said that if Distributors attempt to recruit someone into the business but the timing is not right, "that's where products come in." In a 2016 corporate call, the same Diamond Distributor told listeners products were a "fallback" to the business opportunity.

66.     AdvoCare frequently approved materials with this message, such as a September 2013 training document stating that AdvoCare's business was the main course; its products were the appetizers; selling product over the business was "like going into [a] Steak House and . . . ordering cheese sticks"; and that Distributors could not "create wealth . . . being a professional retailer."

67.     The McDaniels and Hardmans frequently instructed Distributors to focus on selling the business opportunity and to treat products as a fallback.

a.   The McDaniels frequently tell recruits that Danny McDaniel "knew about AdvoCare for a year, but . . . didn't want to have anything to do with it" until a Distributor said to him, "coach I'm gonna make 90k this year in AdvoCare."

b.   Diane McDaniel also frequently dismissed retail earnings as "fun," rather than "real," money. In 2014, she told a Distributor that recruiting customers was "fun but a very slow way to build anything." In 2015, she trained Distributors at a corporate event to never assume people know about the fun money versus the real money in AdvoCare.

22

c.   In 2012, Danny McDaniel taught Distributors to lead with the business opportunity and treat products as a fallback, and called AdvoCare "a leadership factory disguised as a nutrition company."

d.   In a 2012 training document on how to run a business opportunity meeting, the McDaniels told Distributors to quickly show recruits how to earn retail and wholesale commissions—and to then "let them know that you are going to show them how we really earn money in this business . . . through the two types of RESIDUAL income that Advocare provides."

e.   In a corporate training video available on the Hardmans' website until at least November 2016, Lisa Hardman told Distributors not to hide behind products in recruiting consumers.

f.   Until at least May 2014, the Hardmans also instructed Distributors to order posters featuring deceptive annualized income because Distributors otherwise might be tempted to "hide behind the products" rather than sell the business opportunity.

g.   In a 2013 email to Distributors, the Hardmans referred to leading with products rather than the business opportunity as one of the most commonly made rookie mistakes.

h.   In a 2012 Facebook training, Lisa Hardman taught Distributors to "BE IN THE HABIT of handing out OPPORTUNITY brochures, RATHER than Spark brochures" so that prospects "know what you're most passionate about!"

*AdvoCare Relies on Business Opportunity Participants' Purchases*

68.     AdvoCare maintains a vast network of Distributors who make large purchases to participate fully in its compensation plan. Business opportunity participants—conservatively defined as anyone who became an Advisor, purchased 500 PGV of products in a pay period to qualify for Advisor, recruited a downline, or purchased a sales aid—purchased more than $2.87 billion of products between January 2014 and February 2018, totaling more than 80 percent of AdvoCare's product revenue in the period. Of this revenue, $1.98 billion came from business opportunity participants who spent more than they earned from AdvoCare. These participants received back from AdvoCare less than 10 percent of the amount they paid the company, incurring significant losses.

69.     This remains the case despite AdvoCare's introduction of its Preferred Customer program. Preferred Customers accounted for just 18 percent of product revenues in 2017. In addition, because Preferred Customers can convert to Distributors and count their purchases as Preferred Customers toward Advisor qualification, their purchases are often made in pursuit of the business opportunity. AdvoCare even offers a "New Distributor Bonus" to encourage consumers to pursue the business as Preferred Customers. Distributors have three pay periods to earn the bonus—excluding time spent as a Preferred Customer. AdvoCare has instructed consumers to extend their window to earn the bonus by waiting until they have recruits before converting to Distributor.

70.     AdvoCare continues to train Distributors that product users are secondary to business opportunity participants. When AdvoCare introduced the Preferred Customer program, Defendant Connolly told Distributors that he feared "that [they] might think that recruiting a lot of Preferred Customers is somehow going to fill the gap of the

recruitment of bona fide business building Distributors." He emphasized that Preferred

Customers are merely "what we get on our way to finding business builders," and when a

consumer decides they only want products, the goal is to "harvest a Distributor down the

road."

71.     Based on the facts and violations of law alleged in this Complaint, the FTC has

reason to believe that Defendants AdvoCare International, L.P., Brian Connolly, Carlton

Hardman, and Lisa Hardman are violating or are about to violate laws enforced by the

Commission due to their continued roles operating and promoting AdvoCare, a deceptively

marketed recruitment scheme.

72.     Based on the facts and violations of law alleged in this Complaint, the FTC has

reason to believe that Defendants Danny McDaniel and Diane McDaniel are violating or are

about to violate laws enforced by the Commission because, among other things:

a.      The McDaniels engaged in deceptive acts and practices through their participation

in AdvoCare, which they promoted over a period of more than 20 years;

b.      The McDaniels' deception was widespread and permeated their business

practices, including their sales and recruitment presentations, their social media feeds, their

marketing and training activities, and their creation and distribution of sales aides and materials;

c.      The McDaniels have no significant income other than their income from

AdvoCare;

d.      The McDaniels continued to deceptively promote AdvoCare after learning of and

throughout the FTC's investigation and after the company was sued in a 2017 class action

lawsuit that alleged the company was a pyramid scheme;

e.      The McDaniels never voluntarily ceased their deceptive conduct; instead, they continued to engage in deception until AdvoCare abandoned its multi-level marketing structure in July 2019 during its negotiations with the FTC;

f.      The McDaniels have never acknowledged their culpability or shown remorse for their roles in promoting an unlawful pyramid scheme, for making materially deceptive earnings claims, or for sharing the means and instrumentalities for violating Section 5 of the FTC Act, 15 U.S.C. § 45.

## VIOLATIONS OF THE FTC ACT

73.     Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), prohibits "unfair or deceptive acts or practices in or affecting commerce."

74.     Misrepresentations or deceptive omissions of material fact constitute deceptive acts or practices prohibited by Section 5(a) of the FTC Act.

## COUNT I

### Illegal Pyramid

75.     As alleged above, Defendants operate or promote participation in an unlawful scheme in which participants pay money to the company in return for which they receive (1) the right to sell products, and (2) in return for recruiting other participants into the program, the right to receive rewards that are unrelated to the sale of products to ultimate users.

76.     Defendants' operation or promotion of this type of scheme, often referred to as a pyramid scheme, constitutes a deceptive act or practice in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## COUNT II

### Income Misrepresentations

77.     In numerous instances in connection with the advertising, marketing, promotion, offering for sale, or sale of the right to participate in the AdvoCare program, Defendants have represented, directly or indirectly, expressly or by implication, that consumers who become AdvoCare Distributors are likely to earn substantial income.

78.     In truth and in fact, in numerous instances in which Defendants have made the representations set forth in Paragraph 77, consumers who become AdvoCare Distributors are not likely to earn substantial income.

79.     Therefore, Defendants' representations as set forth in Paragraph 77 are false or misleading and constitute deceptive acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## COUNT III

### Means and Instrumentalities

80.     By furnishing AdvoCare Distributors with promotional materials and instructions to be used in recruiting new participants that contain false or misleading representations, Defendants have provided the means and instrumentalities for the commission of deceptive acts and practices.

81.     Therefore, Defendants' practices, as set forth in Paragraph 80, constitute a deceptive act or practice in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

### CONSUMER INJURY

82.     Consumers are suffering, have suffered, and will continue to suffer substantial injury as a result of Defendants' violations of Section 5(a) of the FTC Act. In addition, Defendants have been unjustly enriched as a result of their unlawful acts or practices. Absent

injunctive relief by this Court, Defendants are likely to continue to injure consumers, reap unjust enrichment, and harm the public interest.

## THIS COURT'S POWER TO GRANT RELIEF

83.     Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), empowers this Court to grant injunctive and such other relief as the Court may deem appropriate to halt and redress violations of any provision of law enforced by the FTC. The Court, in the exercise of its equitable jurisdiction, may award ancillary relief, including rescission or reformation of contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies, to prevent and remedy any violation of any provision of law enforced by the FTC.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff FTC, pursuant to Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), and the Court's own equitable powers, requests that the Court:

A.      Award Plaintiff such preliminary injunctive and ancillary relief as may be necessary to avert the likelihood of consumer injury during the pendency of this action and to preserve the possibility of effective final relief, including temporary and preliminary injunctions;

B.      Enter a permanent injunction to prevent future violations of the FTC Act by Defendants;

C.      Award such relief as the Court finds necessary to redress injury to consumers resulting from Defendants' violations of the FTC Act, including rescission or reformation of contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies; and

D.    Award Plaintiff the costs of bringing this action, as well as such other and

additional relief as the Court may determine to be just and proper.

Respectfully submitted,

Alden F. Abbott
General Counsel

Dated:   October 2, 2019

/s/ Aaron Haberman
AARON HABERMAN (lead attorney)
Texas Bar No. 24092468
M. HASAN AIJAZ
Virginia Bar No. 80073
THOMAS B. CARTER
Texas Bar No. 03932300
REID TEPFER
Texas Bar No. 24079444

Federal Trade Commission
1999 Bryan Street, Suite 2150
Dallas, Texas 75201
(214) 979-9381; ahaberman@ftc.gov
(214) 979-9386; maijaz@ftc.gov
(214) 979-9372; tcarter@ftc.gov
(214) 979-9395; rtepfer@ftc.gov

Fax: (214) 953-3079

Attorneys for Plaintiff
FEDERAL TRADE COMMISSION